## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**GREGORY A. LADELE, D.O.,**

    **Plaintiff,**

**v.**                    **CASE NO. 4:20-cv-00080-MW-MAF**

**MHM HEALTH PROFESSIONALS,**
**LLC, f/k/a MHM HEALTH**
**PROFESSIONALS, INC.**

    **Defendant.**

_____/

## <u>DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>

Defendant MHM Health Professionals, LLC ("MHMHP")[1], by and through its undersigned counsel and pursuant to Fed.R.Civ.P. 56, hereby moves for summary judgment on Plaintiff Gregory A. Ladele's ("Plaintiff" or "Dr. Ladele") claims. The grounds upon which the instant motion is based are set forth in the following Supporting Memorandum of Law.

---

[1] MHM Health Professionals, Inc. was converted from a corporation to a limited liability company effective December 31, 2018. Accordingly, MHM Health Professionals, Inc. and MHM Health Professionals, LLC are the same entity.

## SUPPORTING MEMORANDUM OF LAW

## I.

## STATEMENT OF UNCONTROVERTED MATERIAL FACTS

### A.   Background

1.     Centurion of Florida, LLC ("Centurion") maintains a contract with the Florida Department of Corrections ("FDOC") for the provision of comprehensive inmate health services.  Centurion subcontracts with MHMHP, which provides staffing of healthcare providers.  [Doc. 1-3, ¶ 3].

2.     Dr. Ladele was employed by MHMHP as a Regional Medical Director and Medical Executive Director beginning on May 8, 2016.  [Doc. 50-2; Doc. 50-1, 13:13-20].  Dr. Ladele served as the Hospital Medical Director for Reception and Medical Center ("RMC") hospital, but his title was "Regional Medical Director" because RMC is considered a region in itself.  [Doc. 50-1, 14:8-10].

3.     In connection with his employment, Dr. Ladele received MHMHP's Employee Handbook and Code of Business Conduct, and was familiar with MHMHP's six guiding principles and its discrimination and retaliation procedures.  [Doc. 50-3; Doc. 50-1, 15:17-16:16].  Dr. Ladele had a responsibility to ensure that other employees followed these policies as well.  [Doc. 50-1, 15:24-16:2].

### B.   Standard of Care Concerns

1.     MHMHP's primary mission was providing quality healthcare.  [ Doc.

2

50-4 at 2].

2.      MHMHP required its employees to "comply with all safety and health requirements whether established by MHM[HP]; federal, state, or local laws; or our accrediting organizations."  [Doc. 50-3 at 32].

3.      Dr. Ladele's responsibilities as an MHMHP employee included reporting practices or conditions that may have violated a rule, regulation, or safety standard.  [Doc. 50-3 at 28].

4.      In his position as Regional Medical Director, Dr. Ladele was responsible for "[e]nsuring patient medical care [was] appropriate, accurate and received in a timely manner and in compliance with NCCHC, ACA and other relevant standards of care."  [Doc. 50-4 at 2; Doc. 50-1, 18:7-14].

5.      Dr. Ladele was also responsible for reporting quality of care issues that were the result of the performance of the MHMHP medical staff.  [Doc. 50-1, 18:19-23].

6.      Dr. Ladele reported to Statewide Medical Director Dr. Daniel Cherry, III, D.O. ("Dr. Cherry").  [Doc. 50-1, 18:24-25].  Dr. Ladele had no issues getting along with Dr. Cherry.  [Doc. 50-1, 22:5-10].

7.      For administrative matters, including staffing issues, Dr. Ladele reported to Regional Director of Operations Tamara Taylor.  [Doc. 50-1, 19:4-22].

8. Dr. Ladele was also responsible for "[e]nsur[ing] the necessary schedules of assignment . . . provide[d] for continuity of patient care." [Doc. 50-4 at 2].

9. On January 30, 2017, Dr. Ladele emailed the "Centurion Leadership Team[2]" (Janet Dobson, Dr. Cherry, Victoria Love, Josephine Eady, and Priscilla Roberts) regarding concerns with provider coverage for staffing. Dr. Ladele noted that "we have been able to maintain medical charting and adequate patient care with some of our alterations to the current staffing mix." Nevertheless, he asked for recommendations and provided his own recommendations regarding staffing. [Doc. 50-11].

10. On March 30, 2017, Dr. Ladele sent an email to Janet Dobson, Victoria Love, and Dr. Cherry, with the subject "Staffing Concerns (Update)." In the email he referenced his January 30, 2017 email and outlined "changes to [MHMHP's] staffing matrix in two phases, *(Emergent-April 2017)* and *(Urgent-June 2017)*." [Doc. 50-12]. The same day, Janet Dobson responded to Dr. Ladele's email and noted that the proposed April provider schedule was not acceptable. [*Id.*]

11. On March 31, 2017, Dr. Ladele emailed his MHMHP colleagues with concerns relating to the physician schedule and "forecasted some of the grave

---

[2] The Centurion Leadership Team referenced by Dr. Ladele consists entirely of MHMHP employees, given that MHMHP is the entity that provides staffing for the Centurion of Florida contract with the FDOC.

concerns with several examples (ex. decline in Quality of care of the patients and Quality of life of the providers) that will follow with this projected rotated schedule in our meeting."   Dr. Ladele acknowledged that Dr. Cherry preferred that the Administrators manage the schedule, and Dr. Ladele "relinquished [scheduling] responsibilities to Ms. Eady and Ms. Roberts." [Doc. 50-12].

12.    Dr. Ladele also had concerns that other doctors and medical staff did not follow his treatment plan for a patient with mental health concerns who died. [Doc. 50-1, 129:15-132:3].

13.    Dr. Ladele could not identify any law, rule or regulation that governs the activity he complained about.  [Doc. 50-1, 155:10-15].

14.    Dr. Ladele received a positive performance evaluation after he had raised concerns about the activities that he believes violated a law, rule or regulation. [Doc. 50-1, 200:25-201:4].

**C.    Priscilla Roberts Complaints**

1.    Priscilla Roberts was employed by MHMHP as the Heath Services Administrator at RMC.   She had administrative supervisory responsibility over nurses who were treating outpatients during the time that Dr. Ladele was treating outpatients.  [Doc. 50-1, 27:9-13].

2.    Dr. Ladele alleges that, starting in December 2016, he made complaints to Dr. Cherry, Dr. Keller, Janet Dobson, and Victoria Love about Priscilla Roberts'

"impartial treatment." [Doc. 50-1, 113:8-22, 116:6-7]. Dr. Ladele also shared Ms. Roberts' comments and behavior with Tamara Taylor and Josephine Eady. [Doc. 50-1, 136:11-15].

3.    Dr. Ladele had concerns about Ms. Roberts' "overbearing management style and her inappropriate comments." [Doc. 50-1, 119:7-9].

4.    Dr. Ladele alleges that Ms. Roberts made inappropriate comments in management or staff meetings, and made "it difficult in meetings to be politically correct, sensitive, and competent." [Doc. 50-1, 120:5-7].

5.    Dr. Ladele also alleges that Ms. Roberts made inappropriate comments directly to him "several times a week." [Doc. 50-1, 136:3-4].

6.    In December 2016, Dr. Ladele told Dr. Cherry that Ms. Roberts had asked Dr. Ladele, "Do you think I'm racist?" [Doc. 50-1, 118:9-14]. Dr. Ladele also contends that Ms. Roberts asked questions containing stereotypes of African-Americans, such as saying to Dr. Ladele, "[y]ou know, you have a big butt." [Doc. 50-1, 135:10-14]. Dr. Ladele cannot identify any other comments about race that were made to him or in his presence that he thought were inappropriate. [Doc. 50-1, 135:25-136:8].

7.    Dr. Ladele received positive performance evaluations on multiple occasions after he made complaints about Ms. Roberts. [Doc. 50-1, 200:20-24].

**D.**   **Delay In The Inmate's Treatment**

1.     As Regional Medical Director, Dr. Ladele had a hybrid supervisory/direct care role, which included treating high-profile patients.  [Doc. 50-1, 18:1-6].

2.     On June 7, 2017, Dr. Cherry forwarded to Dr. Ladele a request from MHMHP's client, FDOC, that Dr. Ladele arrange for an Inmate (the "Inmate") to start treatment for Hepatitis C at RMC.  [Doc. 50-6].

3.     The Inmate was a high-profile patient.[3]  [Doc. 50-1, 89:18-23].  Dr. Ladele knew the Inmate was a high-profile case.  [Doc. 50-1, 82:22-83:1].  Dr. Ladele had discussions directly with the FDOC about the Inmate.  [Doc. 50-1, 90:9-11].

4.     Dr. Ladele agreed to "have this patient sent to RMC for discussion regarding potential Hep C treatment" and "review his labs and imaging studies prior to his arrival."  [Doc. 50-6].

5.     Hepatitis C is treated with antiviral medications.  [Doc. 50-1, 47:8-10].  Someone infected with Hepatitis C can develop chronic liver disease or cirrhosis.  [Doc. 50-1, 47:15-18].  The likelihood of curing Hepatitis C is in part dependent upon stage of the liver disease.  [Doc. 50-1, 47:19-22].  Once advanced cirrhosis

---

[3] Treatment for Hepatitis C was a sensitive, high-profile issue due to a class action lawsuit against the FDOC alleging that the FDOC refused to provide life-saving treatment to thousands of incarcerated individuals. MHMHP was not a party to this lawsuit; however, MHMHP staff provided healthcare services for inmates in FDOC's custody pursuant to the contract between FDOC and Centurion of Florida, LLC.

develops, it may not be possible to reverse course with an HCV patient.  [Doc. 50-1, 50:8-11].

6.     Dr. Ladele admits that "treating earlier does assist with recovery and with better favorable outcomes."  [Doc. 50-1, 49:8-10].  Dr. Ladele also admits that, with early treatment, it is possible that people with Hepatitis C respond better to treatment and have a higher likelihood of being cured.  [Doc. 50-1, 50:4-7].

7.     On June 9, 2017, Dr. Ladele emailed Brandice Corbin, requesting the Inmate's transfer to RMC.  [Doc. 50-8].  Dr. Ladele sent a follow-up email on June 27, acknowledging that his June 9 email was sent on Ms. Corbin's final day of work.  [*Id.*].  Dr. Ladele is not aware of sending any emails requesting transfer of the Inmate during the 18 days between June 9 and June 27.  [Doc. 50-1, 56:6-15].

8.     Fourteen days later, on July 10, Dr. Ladele emailed Priscilla Roberts and requested her assistance with the transfer. [Doc. 50-8].

9.     On July 12, 2017, the Inmate was transferred to RMC.  [Doc. 50-1, 50:24-51:3].

10.     Dr. Ladele contends that, in June or July, he ordered diagnostic labs for the Inmate but claims that they were mishandled or misplaced, resulting in the labs not being performed.  [Doc. 50-1, 67:3-9].

11.     Dr. Ladele admits that he did not order labs for the Inmate until after his transfer.  [Doc. 50-1, 65:7-8]. At some point in mid-August it came to Dr.

Ladele's attention that the labs had not been performed.  [Doc. 50-1, 67:21-68:3].

12.     Dr. Ladele did not successfully order labs for the inmate until August 18, 2017, approximately 5 weeks after the Inmate was transferred to RMC and some 10 weeks after the FDOC requested Hepatitis C treatment for the Inmate at RMC. [*Id.*; Doc. 50-19].  On August 24, 2017, another doctor ordered a viral load for the inmate.  [Doc. 50-19]*.*

13.     On August 24, 2017, prior to receiving the diagnostic lab results, Dr. Ladele contacted the pharmacist and a nurse where the medication was administered. [Doc. 50-1, 78:8-11].  Dr. Ladele contends that he merely asked Director of Nursing Ashley Weseman "if the pharmacist had available medication tablets to prescribe." [Doc. 50-1, 78:16-18].

14.     However, Ms. Weseman reported to MHMHP that Dr. Ladele directed her to begin treatment on the Inmate immediately and that she could use Hepatitis C medication prescribed for another inmate.  [Doc. 50-19].  She also reported that Dr. Ladele indicated that he was starting treatment immediately without the pertinent information because "this was a high profile case and part of a lawsuit."  [*Id.*]

15.     Ms. Weseman also reported that Dr. Ladele's directives were overridden by the attending physician and Dr. Cherry because they would not use another inmate's medication to treat the Inmate.  [*Id.*]

**E.**   **Dr. Ladele's Suspension and Termination**

1.    Following the August 24, 2017 incident, MHMHP commenced an investigation into Dr. Ladele's failure to provide timely and appropriate patient care to the Inmate.  [Doc. 50-18, ¶5; Doc. 50-20].

2.    The MHM Employee Handbook & Code of Business Conduct provides that, "[i]f circumstances require investigation by either the client or for internal purposes, the employee may be suspended from coming to work until the investigation is complete."  [Doc. 50-3 at 15].

3.    On August 31, 2017, Dr. Ladele was suspended pending an investigation.[4]  [Doc. 50-21; Doc. 50-18, ¶6].

4.    Dr. Ladele admits that, prior to his suspension, no disciplinary actions were taken against him.  [Doc. 50-1, 111:4-9].

5.    Dr. Ladele does not know whether any of the people to whom he reported Priscilla Roberts' alleged impartial treatment made the decision to suspend him.  [Doc. 50-1, 113:23-114:2]

6.    Dr. Ladele was given an opportunity to provide a statement of the events and provided his statement on August 31, 2017.  [Doc. 50-9].

---

[4] In the meeting in which Dr. Ladele was suspended, he said that he had prepared a resignation letter.  [Doc. 50-1, 168:13-16].

7.      Dr. Cherry reviewed the incident and concluded that Dr. Ladele had not delivered timely or appropriate care to the Inmate.  [Doc. 50-22; Doc. 50-18, ¶¶9-10].  Specifically, Dr. Cherry found that "it was unacceptable to start the medication because the [Inmate] did not have baseline labs," and that Dr. Ladele "should have been more aggressive with his work up and appropriate initiation of treatment." [Doc. 50-22].

8.      Dr. Ladele conceded to Dr. Cherry that he should not have initiated a treatment plan prior to the completion of the necessary laboratory reports.  [*Id.*; Doc. 50-1, 84:7-10].  In deposition, Dr. Ladele also admitted that, in retrospect, he wished that the Inmate had been transferred sooner, that he had been more assertive in processing labs and staying on top of the persons responsible for that, and that he had not gone on vacation.  [Doc. 50-1, 174:11-25].

9.      Dr. Cherry emailed his conclusions to Victoria Love and Lisa Lynch. [Doc. 50-22; Doc. 50-18, ¶¶9-10].  Victoria Love shared Dr. Cherry's findings with Tamara Taylor.  [Doc. 50-22].

10.      On September 5, 2017, MHMHP terminated Dr. Ladele's employment based on the investigation and Dr. Cherry's findings, as well as Dr. Ladele's violations of MHMHP's guiding principles of Professionalism and Integrity, his failure to complete his essential job functions, and the potential and significant patient harm arising from Dr. Ladele's failure to deliver timely and appropriate

patient care.  [Doc. 50-20; Doc. 50-18, ¶¶8-11].

11.    The decision to terminate Dr. Ladele was not based on any complaints or concerns reported by Dr. Ladele.  Furthermore, race and age were not factors in the decision to terminate Dr. Ladele.  [Doc. 50-18, ¶¶12-13].

12.    Dr. Ladele cannot identify any similarly situated employee who was treated more favorably than he was treated.  Dr. Ladele is not aware of any other MHMHP physician who was believed to have delayed treatment of a high profile inmate and who was not terminated.  [Doc. 50-1, 95:23-96:1].  He also is not aware of any other MHMHP physician who was believed to have initiated treatment for an inmate without obtaining the necessary labs and who was not terminated.  [Doc. 50-1, 96:2-6].

F.    **Dr. Ladele's Age Discrimination Claim**

1.    Dr. Ladele was 39 years old when he was terminated.  [Doc. 50-1, 98:13].

2.    Dr. Ladele filed two charges of discrimination alleging race discrimination, but never alleged age discrimination.  [Doc. 50-11].  He was represented by counsel when he filed the charges.  [Doc. 50-1, 105:19-21].

3.    Dr. Ladele alleges that, due to his age, he could not have his vacation covered and he had to manage multiple projects.  [Doc. 50-1, 103:10-17].

4.     Dr. Ladele admits that, although he was the youngest, he was the highest paid regional medical director.  [Doc. 50-1, 98:19].  He claims that he was demoted in title in November/December 2016, but admits that his compensation did not change.  [Doc. 50-1, 112:3-5].[5]

5.     Dr. Ladele admits that, other than his termination, there were no employment decisions that affected his compensation or caused him to lose money.  [Doc. 50-1, 97:24-98:2, 112:11-13].

## II.

## ARGUMENT

### A.     Summary Judgment Standard

One of the primary purposes of summary judgment is to isolate and dispose of factually unsupported claims.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-24 (1986).  The party opposing summary judgment may not simply rest upon mere allegations or denials, but must make a sufficient showing to establish the existence of an essential element to the party's case, and on which the party will bear the burden of proof at trial.  *Celotex Corp.,* 477 U.S. at 323-24; *Barfield v. Brierton,* 883 F.2d 923, 933 (11th Cir. 1989).  If the nonmovant "fails to adduce evidence which

---

[5] Dr. Ladele's pay statements reflect his Job as "Medical Director" from pay period 5/1/16 through 3/16/17.  The pay statements during the remainder of his employment reflect Dr. Ladele's Job as "Regional Medical Director."  His pay rate remained the same throughout his employment.  [*See* Doc. 50-15].

would be sufficient, when viewed in a light most favorable to the nonmovant, to

support a jury finding for the nonmovant, summary judgment may be granted."

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254-55 (1986).  The burden on the

nonmoving party is substantial; a mere scintilla of evidence is insufficient to defeat

a motion for summary judgment.  *Id.* at 251-52.

**B.    MHMHP Is Entitled To Summary Judgment On Dr. Ladele's Age Discrimination Claim**

**1.    Dr. Ladele failed to exhaust his administrative remedies.**

Prior to filing a civil action alleging discrimination in violation of Chapter

760, *Fla. Stat.*, an individual seeking relief must file a complaint with the FCHR or

EEOC and exhaust the administrative remedies provided by the FCRA.  *See*

§ 760.11(1) and (4), *Fla. Stat.*; *Sheridan v. State*, 182 So.3d 787 (Fla. 1st DCA

2016).

Where a plaintiff desires to pursue multiple theories of discrimination, he

generally must include each such theory in his charge.  *See Anderson v.

Embarq/Sprint*, 379 Fed. Appx. 924, 926 (11th Cir. 2010) (affirming the district

court's dismissal of a failure-to-promote claim because the plaintiff did not include

those claims in his EEOC filing); *Cheek v. Western and Southern Life Ins. Co*., 31

F.3d 497, 503 (7th Cir. 1994) ("[w]hen an EEOC charge alleges a particular theory

of discrimination, allegations of a different type of discrimination in a subsequent

14

complaint are not reasonably related to them unless the allegations in the complaint can be reasonably inferred from the facts alleged in the charge").

Here, Plaintiff filed two charges alleging race discrimination, but never alleged age discrimination. [Doc. 50-11]. Plaintiff failed to check the "age" box or to include *any* facts that could possibly support an allegation of age discrimination.[6] In his deposition, Dr. Ladele admitted that he was represented by counsel at the time he filed the charges and these were the only charges of discrimination that he filed. [Doc. 50-1, 105:11-25]. Thus, the Court should find that Plaintiff is foreclosed from pursuing an age discrimination claim.

## 2.   Dr. Ladele's reverse age discrimination claim fails.

The Florida Civil Rights Act of 1992 (FCRA) prohibits age discrimination in the workplace. *See* § 760.10(1)(a), *Fla. Stat*. (2020). Moreover, courts have determined that federal case law interpreting the Age Discrimination in Employment Act, 29 U.S.C. § 6231 applies to cases arising under the FCRA. *See Ashkenazi v. S. Broward Hosp. Dist.*, 607 Fed. Appx. 958, 960 (11th Cir. 2015) ("[f]ederal case law interpreting . . . the ADEA applies to cases arising under the FCRA,") (*quoting City*

---

[6] Plaintiff's charges included boilerplate language referring to multiple statutes, including the Americans with Disabilities Act and the Age Discrimination in Employment Act, but failed to offer *any* facts in support of the boilerplate language. *See Booth v. City of Roswell*, 754 Fed. Appx. 834, 836 (11th Cir. 2018) ("The allegations in the judicial complaint must be 'reasonably related' to the EEOC charge with no material differences between the two. Allegations of new acts of discrimination, offered as the essential basis for the requested judicial review, are not appropriate") (citations omitted).

*of Hollywood v. Hogan*, 986 So.2d 634, 641 (Fla. 4th DCA 2008)); *Joshua v. City of Gainesville*, 768 So.2d 432, 435 (Fla. 2000).

Accordingly, courts have adopted the ADEA *prima facie* analysis for claims under the FCRA and require that the plaintiff prove: "1) the plaintiff is a member of a protected class, *i.e., at least forty years of age*; 2) the plaintiff is otherwise qualified for the positions sought; 3) the plaintiff was rejected for the position; 4) the position was filled by a worker who was substantially younger than the plaintiff." *City of Hollywood*, 986 So.2d at 641 (emphasis added). Here, Plaintiff simply cannot make a *prima facie* case because he was under the age of 40 at the time of the alleged discrimination.

In *Gen. Dynamics Land Sys. v. Cline*, 540 U.S. 581 (2004), the United States Supreme Court ruled that the ADEA does not prohibit reverse discrimination, i.e., favoring the old over the young. The Court stated that: "[t]he ADEA was concerned with protecting a relatively old worker from discrimination that worked to the advantage of the relatively young." *Id.* Consequently, courts have ruled that "[b]eing treated differently because of a younger age is not age discrimination." *Sly v. Sec'y, VA*, 2020 U.S. Dist. LEXIS 51062, at *33 (M.D. Fla. Mar. 24, 2020).

This interpretation has been repeatedly adopted by courts analyzing claims under the FCRA. *See Walker v. City of Pembroke Pines*, 2013 Fla. App. LEXIS 12346 (Fla. 4th DCA 2013); *see also Petrik v. City of Pembroke Pines*, 120 So.3d

102 (Fla. 4th DCA 2013); *City of Hollywood v. Hogan*, 986 So.2d 634 (Fla. 4th DCA 2008).

Plaintiff also cannot make a *prima facie* age discrimination case because he cannot demonstrate any adverse employment actions taken by MHMHP.   In his deposition, Plaintiff identified two adverse actions that he alleges occurred as a result of his age: (1) he could not have his vacation covered; and (2) he had to manage multiple projects.   However, neither of the alleged actions is an adverse employment action by MHMHP that adversely affected Dr. Ladele.   *See Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000) ("[a]n adverse employment action is an ultimate employment decision, such as discharge or failure to hire, or other conduct that alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee") (internal citation omitted).

Accordingly, summary judgment should be granted in MHMHP's favor on Plaintiff's age discrimination claim.[7]

---

[7] Even if Plaintiff could establish a *prima facie* case for age discrimination, Plaintiff's claims fail because MHMHP had legitimate and non-discriminatory business reasons for suspending and terminating Plaintiff's employment and Plaintiff cannot prove pretext. *See* section II.C, *infra*.

**C.    MHMHP Is Entitled To Summary Judgment On Dr. Ladele's Race Discrimination Claim**

In a race discrimination case, the plaintiff bears the burden of first establishing a *prima facie* case of race discrimination.  Where, as here, there is no direct or statistical evidence of discrimination, a plaintiff may rely upon circumstantial evidence to overcome summary judgment.  Under *McDonnell Douglas*, a plaintiff first must establish a *prima facie* case by presenting evidence that (1) he is a member of a protected class; (2) he was subjected to adverse employment action; (3) his employer treated similarly situated employees outside of his class more favorably; and (4) he was qualified to do the job.  *Maynard v. Bd. of Regents of Div. of Universities of Fla. Dep't of Educ.*, 342 F.3d 1281, 1289 (11th Cir. 2003) (*citing McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).

Once a plaintiff establishes a *prima facie* case, the burden shifts to the employer to articulate a legitimate business reason for its employment decision, and the plaintiff must show that reason is mere pretext for unlawful discrimination.  "[A] reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason."  *Hudson v. Blue Cross Blue Shield of Alabama*, 431 Fed. Appx. 868, 869 (11th Cir. 2011) (*quoting St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)).

"Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee

cannot succeed by simply quarreling with the wisdom of that reason." *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000). The Court "must evaluate whether the plaintiff has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the proffered reason so that a reasonable factfinder could conclude that it is unworthy of credit." *Jefferson v. Burger King Corp.*, 505 Fed. Appx. 830, 834 (11th Cir. 2013).

1. **The only adverse employment actions are Dr. Ladele's suspension and termination.**

Not all conduct of an employer that negatively affects an employee constitutes an adverse employment action. *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1238 (11th Cir. 2001). Instead, there must have been a serious change to the terms and conditions of plaintiff's employment. *Id.* Adverse action must result in a change of the terms and conditions of employment such as reduction in pay, benefits, or responsibilities. *See Manley v. DeKalb County Georgia*, 587 Fed. Appx. 507, 513 (11th Cir. 2014).

Here, Dr. Ladele admits that, prior to his suspension, no disciplinary actions were taken against him. He also admits that there were no employment decisions that affected his compensation or caused him to lose money other than his termination. Although Dr. Ladele claims that he was demoted in his title in November/December 2016 he admits that his compensation did not change. In fact, during his employment, Dr. Ladele was the highest paid regional medical director.

Therefore, the only adverse employment actions at issue with regard to Dr. Ladele's race discrimination claim are his suspension and termination.

2.    **Dr. Ladele cannot identify anyone similarly situated who was treated more favorably.**

Plaintiff's race discrimination claim fails the third prong of a *prima facie case* because he cannot identify any similarly situated comparators.  To meet the third prong, a plaintiff must establish that the comparator: (1) "engaged in the same basic conduct (or misconduct) as the plaintiff;" (2) "will have been subject to the same employment policy, guidelines, or rule as the plaintiff;" (3) "will ordinarily (although not invariably) have been under the jurisdiction of the same supervisor as the plaintiff;" and (4) "will share the plaintiff's employment or disciplinary history." *Lewis v. City of Union, GA*, 918 F.3d 1213, 1227-28 (11th Cir. 2019) (*en banc*).  *See Silvera v. Orange Cty. Sch. Bd*., 244 F.3d 1253, 1259 (11th Cir. 2001) ("it is necessary to consider whether the employees are involved in or accused of the same similar misconduct") (citations and quotations omitted).

Dr. Ladele cannot identify any physician outside of his race who delayed treatment of a high profile inmate or who was believed to have initiated treatment for an inmate without obtaining the necessary labs and who was not terminated. Accordingly, Dr. Ladele cannot establish a *prima facie* case because he cannot identify any similarly situated comparator as defined in *Lewis v. City of Union*, *supra*.

### 3. **MHMHP had legitimate business reasons for Dr. Ladele's suspension and termination.**

MHMHP suspended Dr. Ladele pending an investigation into his alleged violations of company policy – the conduct that led to his termination. The MHMHP Employee Handbook & Code of Business Conduct, which Dr. Ladele admits having received, provides that "[i]f circumstances require investigation by either the client or for internal purposes, the employee may be suspended from coming to work until the investigation is complete." Accordingly, MHMHP suspended Dr. Ladele consistent with company policy as it investigated the allegations that led to Dr. Ladele's termination – not because of Dr. Ladele's race.

Similarly, Dr. Ladele's termination was not based on race, but was based instead on legitimate, nondiscriminatory reasons. During the investigation, Dr. Ladele provided a statement of events and Dr. Cherry reviewed the incident. Dr. Cherry's professional conclusion was that "it was unacceptable to start the medication because the patient did not have baseline labs" and Dr. Ladele "should have been more aggressive with his work up and appropriate initiation of treatment." Furthermore, Dr. Ladele himself admits that he should not have initiated a medical treatment plan prior to the completion of the necessary laboratory reports.

Ultimately, MHMHP determined that Dr. Ladele failed to deliver timely and appropriate patient care. For these legitimate business reasons, MHMHP terminated Dr. Ladele. *See Hatfield v. Bio-Medical Applications of Ala., Inc.*, 2012 U.S. Dist.

LEXIS 138361 (M.D. Ala Sept. 4, 2012) (plaintiff's violations of policies and procedures and endangering patient safety a legitimate business reason for termination); *see also Dougherty v. Mem'l Sloan-Kettering Cancer Ctr.*, 2002 U.S. Dist. LEXIS 13216 (S.D. N.Y. July 16, 2002) (plaintiff's errors that could have endangered patients' health and safety were a legitimate basis for termination).

### 4.    **Dr. Ladele cannot demonstrate pretext.**

"When an employer asserts misconduct by an employee as the legitimate reason for its action, the pretext inquiry focuses on the employer's beliefs and whether the employer was dissatisfied with the employee for nondiscriminatory reasons, 'even if mistakenly or unfairly so.'" *Siddiqui v. NetJets Aviation, Inc.*, 773 Fed. Appx. 562, 564 (11th Cir. 2019); *see also Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010) ("[t]he inquiry into pretext centers on the employer's beliefs, not the employee's beliefs, and to be blunt about it, not on reality as it exists outside of the decisionmaker's head"); *Hill v. Treatment Mgmt. Co., LLC*, 2019 U.S. Dist. LEXIS 183597, at *44 (S.D. Fla. Oct. 22, 2019) ("the relevant inquiry is what the employer believed the situation to be—not how anyone else, including the employee, perceived the situation or how the situation appears objectively from the outside").

Dr. Ladele cannot show that the reasons for his suspension and termination were pretextual.  It is undisputed that the medical care for the Inmate, a high profile

patient, was delayed and that Dr. Ladele should have obtained the laboratory results before starting medication as set forth in Dr. Cherry's review.  In fact, Dr. Ladele admits that he told Dr. Cherry that he should have obtained labs before starting the medication for the Inmate.  It is also undisputed that in reliance on Dr. Cherry's review[8], MHMHP had a good faith basis to belief that Dr. Ladele violated MHMHP's guiding principles, failed to complete his essential job functions, and posed potential harm due to his failure to deliver timely and appropriate patient care.

In short, there is no "significantly probative evidence" that MHMHP's proffered reasons for the decision to suspend and terminate Dr. Ladele were a pretext for discrimination.  Therefore, summary judgment should be entered for MHMHP on Dr. Ladele's race discrimination claim.

**D.   MHMHP Is Entitled To Summary Judgment On Dr. Ladele's FCRA Retaliation Claim**

To establish a *prima facie* case of retaliation under Title VII, Dr. Ladele is required to show that:  1) he engaged in protected activity; 2) he suffered an adverse employment action; and 3) there is a causal link between his protected activity and the adverse action.  *Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1312 (11th Cir. 2002); *Gupta v. Florida Board of Regents*, 212 F.3d 571, 587 (11th Cir. 2000).

---

[8] *See Wade v. Dept. of Juvenile Justice,* 2017 WL 6345820, at *2 (N.D. Fla. Sept. 21, 2017) ("a mere belief that reasonable minds could differ regarding how the investigation could have been conducted, without more, is not evidence of pretext").

1.   **Dr. Ladele did not engage in protected activity.**

To engage in protected activity under the FCRA, a plaintiff must show that he "opposed an employment practice that the employee subjectively believed to be unlawful under Title VII and that the employee's subjective belief was reasonable in light of the facts and record presented." *Vinson v. Department of Corrections*, 672 F. Supp. 2d 1247, 1253 (N.D. Fla. 2009). "The objective reasonableness of an employee's activities under the opposition clause depends both on the reasonableness of the employee's belief that the opposed employment action occurred and the reasonableness of the employee's belief that the opposed employment action was unlawful." *Id.*

It is well established that "[w]orkplace conduct is not measured in isolation; instead, 'whether an environment is sufficiently hostile or abusive' must be judged 'by looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Clark County School District v. Breeden*, 532 U.S. 268, 270-71 (2001) (*quoting Faragher v. Boca Raton*, 524 U.S. 775, 786 (1998)).

Here, Dr. Ladele cannot show that he made an objectively reasonable complaint of unlawful activity within the meaning of Title VII. Dr. Ladele's FCRA retaliation claim rests solely on alleged complaints that he made about Priscilla

Roberts' overbearing management style and inappropriate comments. However, Ms. Roberts had administrative responsibility over outpatient nurses – not Dr. Ladele. Thus, her management style did not unreasonably interfere with his work performance, and complaints about her management style were not protected activity.

Furthermore, Dr. Ladele's complaints about Ms. Roberts' comments are insufficient to support a FCRA retaliation claim. Dr. Ladele can only point to two race-based comments by Ms. Roberts: (1) Ms. Roberts asking Dr. Ladele, "Do you think I'm racist?" and (2) Ms. Roberts telling Dr. Ladele, "[y]ou know, you have a big butt," in connection with a stereotype about African Americans having big butts.

The Supreme Court has repeatedly held that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Id.* Thus, viewed objectively, Dr. Ladele's complaints about Ms. Roberts were not protected activity.

### 2.  Dr. Ladele cannot establish a causal connection between his reports and his suspension or termination under the FCRA.

Following the Supreme Court's decision in *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338, (2013), a plaintiff must show more than temporal proximity between the protected activity and his or her

termination to satisfy the causation element of a *prima facie* case of retaliation. Instead, a plaintiff must establish that his or her protected activity was a "but-for" cause of the adverse action by the employer. *Nassar,* 570 U.S. at 362.

The "but-for" cause element "requires a closer link than mere proximate causation, it requires that the proscribed animus have a determinative influence in the employer's adverse decision." *Sims v. MVM, Inc.*, 704 F.3d 1327, 1335-36 (11th Cir. 2013). Moreover, "[c]ausation 'must be based on more than mere speculation, conjecture or surmise.'" *Koscis v. Florida State University,* 2019 WL 1232866, at *12 (N.D. Fla. Feb. 27, 2019), *quoting Bones v. Honeywell Int'l, Inc.,* 365 F.3d 869, 875 (10th Cir. 2004).

Here, Dr. Ladele cannot make the required but-for showing. There is no temporal proximity and there is no other evidence of a causal connection. The record is wholly devoid of any evidence that Dr. Ladele's complaints about Ms. Roberts caused his suspension or termination. To the contrary, it is undisputed that Dr. Ladele received multiple positive performance evaluations after he complained about Ms. Roberts.

Moreover, the reports MHMHP received regarding Dr. Ladele's treatment of the Inmate broke any chain of causation between Dr. Ladele's protected activity and his suspension and termination. *See Henderson v. FedEx Express,* 442 Fed. Appx. 502, 506 (11th Cir. 2011) ("intervening acts of misconduct can break any causal link

between the protected activity and the adverse employment action"); *Jones v. Florida Department of Corrections,* 2019 WL 10734655 (N.D. Fla. Jan. 25, 2019) (plaintiff failed to establish causation between the protected activity and the adverse action because intervening acts of misconduct broke the chain of causation). Accordingly, Dr. Ladele cannot make the required but-for showing and, therefore, his *prima facie* case of retaliation under the FCRA fails.

3. **Dr. Ladele cannot prove that Defendant's legitimate, nonretaliatory reasons for his suspension and termination are pretextual.**

Whether the reasons provided by MHMHP for suspending and terminating Dr. Ladele were a pretext for retaliation must be established by Dr. Ladele through "significantly probative evidence." *Johnson v. Atlanta Indep. Sch. Sys.*, 137 Fed. Appx. 311, 315 (11th Cir. 2005); *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1228 (11th Cir. 1993) (citations omitted). Dr. Ladele cannot meet his burden "by simply quarreling with the wisdom of that reason." *Wood v. Calhoun Cty. Fl.*, 626 Fed. Appx. 954, 956 (11th Cir. 2015), *quoting Chapman v. Al Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (*en banc*). Instead, "the inquiry into whether an employer's proffered reasons were merely pretextual centers on the employer's beliefs, not the beliefs of the employee or even objective reality." *Lopez v. AT&T Corp.*, 457 Fed. Appx. 872, 874 (11th Cir. 2012); *Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1253, 1266-67 (11th Cir. 2010).

Here, the evidence shows that Dr. Ladele was suspended pending an investigation into his care of the Inmate and then terminated when the review by Dr. Cherry concluded that Dr. Ladele had failed to provide proper patient care. The termination decisionmakers were justified in their reliance on the conclusions by Dr. Cherry, and Dr. Ladele admits that he had no issues with Dr. Cherry. Thus, Dr. Ladele has not shown that the legitimate and nonretaliatory reasons for his suspension and termination, were mere pretext for retaliation.

## E.  MHMHP Is Entitled To Summary Judgment On Dr. Ladele's Whistleblower Act Retaliation Claim

Retaliation claims under the Florida Private Whistleblower Act ("FWA") are guided by the same analysis as a Title VII federal claim. *See Rutledge v. SunTrust Bank*, 262 Fed. Appx. 956, 958 (11th Cir. 2008). Accordingly, Dr. Ladele must establish a *prima facie* case under the FWA by demonstrating: (1) he engaged in statutorily protected expression; (2) he suffered an adverse employment action; (3) the adverse employment action was causally linked to the protected activity. *Graddy v. Wal-Mart Stores East, LP*, 237 F.Supp. 3d 1223, 1226 (M.D. Fla. Feb. 14, 2017) *(citing Kearns v. Farmer Acquisition Co.,* 157 So.3d 458, 462 (Fla. 2d DCA 2015).

The burden then switches to the defendant to offer a legitimate reason for the adverse action. If the defendant can do so, the plaintiff then must prove that the proffered reason is "mere pretext" for prohibited, retaliatory conduct. *See Olmsted*

*v. Taco Bell Corp*., 141 F.3d 1457, 1460 (11th Cir. 1998); *see also McDonnell Douglas*, *supra*.

**1.    Dr. Ladele did not complain about a violation of laws, rules, or regulations.**

Under the FWA, an employer is prohibited from taking retaliatory action against an employee who has "[o]bjected to, or refused to participate in, any activity, policy, or practice of the employer which is in violation of a law, rule, or regulation." Section 448.101(4), *Florida Statutes,* specifically defines a "law, rule, or regulation" as "any statute or ordinance applicable to the employer and pertaining to business." § 448.101(4), *Fla. Stat.*

When a plaintiff's claim does not concern a violation of a law, rule, or regulation, but rather a violation of company policy, it does not fall within the coverage of the FWA. *See Lawson v. Dollar Gen. Corp.*, 2006 U.S. Dist. LEXIS 47082 (M.D. Fla. July 12, 2006). Accordingly, an employee's complaint about a violation of *company policy* does *not* constitute protected activity under the FWA. *See New World Communications of Tampa, Inc. v. Akre*, 866 So.2d 1231, 1234 (Fla. 2d DCA 2003) (FCC's policy against the intentional falsification of the news did not qualify as the required "law, rule, or regulation" under § 448.102), *clarified on other grounds*, 866 So.2d 1231 (Fla. 2d DCA 2004), *reh'g denied*, 2004 Fla. LEXIS 462 (Fla. Feb. 27, 2004); *Morin v. Day & Zimmermann NPS, Inc.,* 2008 WL 2543432 at *5-7 (S.D. Fla. June 25, 2008) (procedure developed by company was not a law, rule

or regulation); *Little v. Foster Wheeler Constr., Inc.,* 2010 WL 2035546, at *9 (S.D. Fla. May 24, 2010) (employer's policies and procedures were not within the scope of protections provided by FWA), *aff'd* 432 Fed. Appx. 907 (11th Cir. 2011).

In deposition, while Dr. Ladele contended that he reported concerns about the standard of care for patients, including staffing concerns and complaints of other doctors and medical staff not following Dr. Ladele's proscribed treatment plans, he could not identify any law, rule or regulation that governs the activity he complained about.

Dr. Ladele's complaints, if true, would constitute, at most, inadequate or substandard medical care. Accordingly, Dr. Ladele cannot demonstrate that he engaged in protected activity and cannot establish a *prima facie* case. *See Lawson v. Dollar Gen. Corp.*, 2006 U.S. Dist. LEXIS 47082, at *8 (M.D. Fla. July 12, 2006) (granting summary judgment because claims of violation of company policies do not meet the definition of "law, rule, or regulation" under the FWA).

### 2.   Dr. Ladele cannot establish that any alleged violations were committed by "the employer."

Section 448.102(3), *Florida Statutes*, prohibits an employer from taking retaliatory personnel action against an employee who "[o]bjected to, or refused to participate in, any activity, policy, or practice *of the employer* which is in violation of a law, rule, or regulation." (Emphasis supplied). A violation of law by an employee, as opposed to a defendant employer, cannot support a claim based on the

FWA unless the illegal conduct was ratified by the employer.  *See McIntyre v. Delhaize Am., Inc.*, 403 Fed. Appx. 448, 450 (11th Cir. 2010); *Sussan v. Nova Southeastern Univ.*, 723 So.2d 933 (Fla. 4th DCA 1999).

Here, any inadequate or substandard medical care complained of by Dr. Ladele was *not* an illegal activity, policy or practice of MHMHP.  Instead, substandard medical was *contrary to MHMHP's company policies*.  Dr. Ladele admitted that he was responsible for reporting quality of care medical issues that were the result of performance of the MHMHP medical staff.  Accordingly, any substandard medical care was not *pursuant* to MHMHP's policies.

Moreover, in order for an employer to be held liable, "the conduct must in some way further the interests of the employer or be motivated by those interests." *Bennett v. Godfather's Pizza, Inc.*, 570 So.2d 1351 (Fla. 3d DCA 1990).  Any alleged actions by an individual taken in contravention of MHMHP's policies cannot have been motivated by a desire to further the company's interests.  *See Morera v. Sears Roebuck and Co.*, 652 Fed. Appx. 799 (11th Cir. 2016) (affirming summary judgment in favor of the employer because the conduct of its employee was "not something [his] employment contemplated"); *LaRoche v. Denny's Inc.*, 62

F.Supp.2d 1366 (S.D. Fla. July 23, 1999) (employee was acting outside out of the scope of his employment because his action violated explicit company policies).[9]

Accordingly, because Dr. Ladele did not complain about unlawful acts by his employer, but rather about actions by individual employees that were undertaken in contravention of company policy, he cannot establish that he engaged in protected activity within the meaning of the FWA.

### 3. The "Manager Rule" precludes Dr. Ladele's complaints from constituting protected activity.

The "Manager Rule" originated in *McKenzie v. Renberg's, Inc.,* 94 F.3d 1478 (10th Cir. 1996). It provides that a management employee does not engage in protected activity for purposes of a retaliation claim unless he steps outside his normal job duties to take action adverse to his employer. *Id.* at 1486-87 (rejecting retaliation claim of a personnel director who reported wage and hour violations to management; the report was part of her job to alert the employer to possible violations and liability).

The Manager Rule was adopted by the Eleventh Circuit in *Brush v. Sears Holding Corp.,* 466 Fed. Appx. 781 (11th Cir. 2012). *See also Hagan v. Echostar Satellite, L.L.C.,* 529 F.3d 617, 627-28 (5th Cir. 2008) (affirming district court's

---

[9] *See also Bostain v. Westgate Lakes LLC,* 2011 U.S. Dist. LEXIS 65184 (M.D. Fla. June 14, 2011); *Ruiz v. Aerorep Grp. Corp.,* 941 So.2d 505, 507 (Fla. 3d DCA 2006) (dismissing plaintiff's FWA claim after concluding that the employer was not responsible for a tort of an employee where the tort was not committed with the purpose of benefitting the interests of the employer).

grant of judgment as a matter of law based on the manager rule and reasoning that if an employee were not required to "step outside the role" to engage in statutorily protected conduct "nearly every activity in the normal course of a manager's job would potentially be protected activity," and "[a]n otherwise typical at-will employment relationship could quickly degrade into a litigation minefield, with whole groups of employees—management employees, human resources employees, and legal employees, to name a few—being difficult to discharge without fear of a lawsuit").

The Manager Rule has been applied to FWA claims by federal courts sitting in Florida. *See, e.g. Wolf v. Pacific Natl Bank,* 2010 WL 5888778, at *10 (S.D. Fla. Dec. 28, 2010) ("[i]t is well established in [whistleblower] cases that a plaintiff does not engage in protected activity by disclosing violations of law as part of his job responsibilities"); *Goodwin v. Dyncorp Int'l LLC,* 2015 U.S. Dist. LEXIS 195897, (N.D. Fla. Mar. 30, 2015) (granting summary judgment on FWA claim based on the Manager Rule).

Here, the record is undisputed that Dr. Ladele was performing his required job duties when he reported alleged standard of care violations. Dr. Ladele admitted in deposition that his job duties included reporting standard of care issues. *See Goodwin*, 2015 U.S. Dist. LEXIS 195897 at *9 ("[b]ecause his own testimony makes clear that he was 'doing his job[,]' . . . he was not engaged in a statutorily protected

activity"). Dr. Ladele therefore did not "cross the line from being an employee 'performing [his] job . . . to an employee lodging a personal complaint.'" *Brush,* 466 Fed. Appx. at 787 (*quoting McKenzie v. Renberg's Inc.,* 94 F.3d at 1486). Therefore, under the Manager Rule, Dr. Ladele cannot establish that he engaged in statutorily protected activity.

### 4. Dr. Ladele cannot establish causation or pretext to support his FWA retaliation claims.

Even *assuming arguendo* that Dr. Ladele engaged in protected activity – which MHMHP denies – he cannot establish a causal connection between his alleged protected activity and his suspension or termination. *See O'Neill v. St. Johns River Water Mgmt. Dist.*, 341 F. Supp. 3d 1292, 1303 (M.D. Fla 2018) (applying "but-for" causation standard to claims under the FWA).

Dr. Ladele cannot demonstrate that his concerns about patient care were the but-for cause of his suspension and termination. As discussed above, there is no temporal proximity and no evidence of a causal link between Dr. Ladele's complaints and his supervision and termination. In fact, Dr. Ladele admits that he was given a positive performance evaluation after he had repeatedly raised concerns about the activities that he believes violated a law, rule or regulation. Moreover, the reports MHMHP received about Dr. Ladele's treatment of the Inmate constituted intervening acts that broke any chain of causation.

34

Similarly, as discussed above, MHMHP had legitimate and nonretaliatory reasons for his suspension and termination, and Dr. Ladele cannot show that MHMHP's reliance on the report by Ms. Weseman and the conclusions of Dr. Cherry was a mere pretext.  *See* Section II.D.3*., supra*.

## III.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendant respectfully requests that the Court enter an Order granting summary judgment in its favor.

## <u>CERTIFICATE OF WORD LIMIT</u>

I hereby certify that there are 7,692 words in this document and that it has been typed in 14-point font.

<div style="margin-left:40%">

Respectfully submitted,

/s/ Richard C. McCrea, Jr.
Richard C. McCrea, Jr.
Florida Bar No. 351539
Email: mccrear@gtlaw.com
Catherine H. Molloy
Florida Bar No. 33500
Email: molloyk@gtlaw.com
Cayla M. Page
Florida Bar No. 1003487
Email: pagec@gtlaw.com
GREENBERG TRAURIG, P.A.
101 E. Kennedy Boulevard
Suite 1900
Tampa, Florida 33602
(813) 318-5700 – Telephone
(813) 318-5900 – Facsimile

</div>

*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on March 22, 2021, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to:

Jim Garrity
Marie A. Mattox, P.A.
203 North Gadsden Street
Tallahassee, Florida 32301
jim@jimgarrittylaw.com
jim@mattoxlaw.com
elizabeth@mattoxlaw.com
federalcourt@mattoxlaw.com
jimgarritycell@gmail.com

/s/ Richard C. McCrea, Jr.
Attorney